# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

FILED
7-20-15
CLERK, U. S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

PARKERVISION, INC.,
a Florida corporation,

    Plaintiff,

v.

INFOSONICS CORPORATION,
a California corporation

    Defendant.

)
)
)
)
)
)
)
)
)

Case No. 3:15-cv-895-J-34PDB

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, ParkerVision, Inc., sues defendant, InfoSonics Corporation, and alleges:

1.    ParkerVision is a Florida corporation with its principal places of business at 7915 Baymeadows Way, Suite 400, Jacksonville, Florida 32256 and 1035 Greenwood Boulevard, Lake Mary, Florida 32746.

2.    InfoSonics is a California corporation with places of business at 3636 Nobel Drive, Suite 325, San Diego, California 92122 and 1825 NW 87th Avenue, Miami, Florida 33172.

3.    InfoSonics conducts business throughout the United States, including the Middle District of Florida.

4.     InfoSonics infringes ParkerVision's patents throughout the United States, including the Middle District of Florida.

5.     This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 101 *et seq.*, including 35 U.S.C. §§ 271 and 281-85. This Court has exclusive subject matter jurisdiction over this case for patent infringement pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.     Personal jurisdiction exists over InfoSonics because it has a place of business in Miami, Florida, conducts business in Florida and has sufficient minimum contacts within the State of Florida and the Middle District of Florida. Personal jurisdiction also exists over InfoSonics because it, directly or through subsidiaries or intermediaries, makes, uses, offers for sale, sells, imports, advertises, makes available and/or markets products in the United States, the State of Florida, and the Middle District of Florida that infringe one or more claims of each of ParkerVision's patents-in-suit, as described more particularly below.

7.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. §§ 1391(b), 1391(d), and 1400(b).

8.     Since as early as 1990, ParkerVision has pioneered the development of numerous telecommunication technologies, resulting in hundreds of patents. In the mid-1990s, while working on a radio-controlled tracking camera, engineers at ParkerVision developed a novel down-converter that allowed radio frequency ("RF") receivers to be built smaller, cheaper and

2

with greatly improved performance. As a result of continued work with this novel down-conversion technology, ParkerVision's engineers developed novel up-converter and other complementary wireless communications technologies.

9.    ParkerVision's efforts to develop its down-conversion, up-conversion, and complementary wireless communications technologies culminated in several patents, including U.S. Patent Nos. 7,016,663 ("the '663 Patent"), 8,160,534 ("the '534 Patent"), and 8,195,149 ("the '149 Patent"), (collectively "the patents-in-suit"), among other patents.

10.    ParkerVision's patented ideas help make the receivers and transmitters used in today's mobile devices (such as smart phones and cellular phones) smaller, cheaper, more efficient and higher performance.

11.    The '663 Patent. On March 21, 2006, the U.S. Patent and Trademark Office issued the '663 Patent, entitled "Applications Of Frequency Translation" to David F. Sorrells, Michael J. Bultman, Robert W. Cook, Richard C. Looke, and Charley D. Moses, Jr.  On December 19, 2006, the U.S. Patent and Trademark Office issued a Certificate of Correction for the '663 Patent specification and claims. ParkerVision is the owner by assignment of the '663 Patent and possesses all rights of recovery under the '663 Patent. All required maintenance fees have been paid on the '663 Patent. A copy of the '663 Patent is attached as Exhibit A.

12.    The '534 Patent. On April 17, 2012, the U.S. Patent and Trademark Office issued the '534 Patent, entitled "Applications Of Universal Frequency

3

Translation," to David F. Sorrells, Michael J. Bultman, Robert W. Cook, Richard C. Looke, and Charley D. Moses, Jr. ParkerVision is the owner by assignment of the '534 Patent and possesses all rights of recovery under the '534 Patent. All required maintenance fees have been paid on the '534 Patent. A copy of the '534 Patent is attached as Exhibit B.

13.     The '149 Patent. On June 5, 2012, the U.S. Patent and Trademark Office issued the '149 Patent, entitled "Wireless Protocol Converter," to Jeffrey L. Parker. ParkerVision is the owner by assignment of the '149 Patent and possesses all rights of recovery under the '149 Patent. All required maintenance fees have been paid on the '149 Patent. A copy of the '149 Patent is attached as Exhibit C.

14.     ParkerVision is the sole and exclusive owner of all rights, title and interest to the patents-in-suit, including the right to recover damages for past infringement. ParkerVision owned the patents-in-suit throughout the period of InfoSonics' infringement and still owns the patents-in-suit. ParkerVision has not granted InfoSonics a license to practice the patents-in-suit.

15.     The patents-in-suit are valid and enforceable.

16.     InfoSonics has and continues to make, use, import into the United States, market, offer for sale and sell in the United States phone devices, such as the S470 that infringes the patents-in-suit, and induce or contribute to the infringement of the patents-in-suit by others, including original equipment

manufacturers ("OEMs") and end-users. These products are sold in the United States, including the state of Florida.

17. ParkerVision has been damaged as a result of InfoSonics's infringing conduct. InfoSonics is therefore liable to ParkerVision in an amount that adequately compensates ParkerVision for InfoSonics' infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284. Unless enjoined by this Court, InfoSonics will continue to infringe the patents-in-suit, continuing to damage ParkerVision and causing irreparable harm.

## Count One—Infringement of the '663 Patent

18. ParkerVision incorporates the allegations in paragraphs 1 through 17, above.

19. InfoSonics' telephones infringe at least one claim of the '663 Patent.

20. InfoSonics has directly infringed and continues to directly infringe the '663 Patent by making, using, selling, offering for sale or importing into the United States telephone products and/or methods covered by one or more claims of the '663 Patent. InfoSonics' telephone products that infringe one or more claims of the '663 Patent include the S470 and any other InfoSonics telephone device that is capable of down-converting a radio frequency as claimed in the '663 Patent.

5

21.   InfoSonics makes, uses, sells, offers for sale, or imports into the United States these telephone products and thus directly infringes at least one or more claims of the '663 Patent.  InfoSonics also uses these telephone products via its internal use and testing in the United States, directly infringing one or more claims of the '663 Patent.

22.   InfoSonics has induced and continues to induce and contribute to infringement of the '663 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by one or more claims of the '663 Patent including InfoSonics' telephone products listed above.  InfoSonics provides these telephone products to others, such as manufacturers, customers, resellers and end-use consumers who, in turn, use, offer for sale, or sell in the United States these products that infringe one or more claims of the '663 Patent.

23.   InfoSonics indirectly infringes the '663 Patent by inducing infringement by others, such as OEMs, manufacturers, customers, resellers and end-use consumers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the OEMs, manufacturers, customers, resellers and end-use consumers of the infringing products.

24.   InfoSonics has had actual knowledge of or, was at the latest, received notice of the '663 Patent as of the date this lawsuit was filed.

25.     InfoSonics designed the infringing telephone products such that they would each infringe one or more claims of the '663 Patent if made, used, sold, offered for sale, or imported into the United States. InfoSonics provides the infringing products to others, such as OEMs, manufacturers, customers, resellers and end-use consumers, who, in turn, offer for sale, sell, import into, or use these infringing products to infringe one or more claims of the '663 patent. Through its manufacture and sale of the infringing products, InfoSonics specifically intended its OEMs, manufacturers, customers, resellers and end-use consumers to infringe one or more claims of the '663 Patent.

26.     InfoSonics specifically intends for others, such as OEMs, manufacturers, customers, resellers and end-use consumers, to directly infringe one or more claims of the '663 Patent in the United States. For example, InfoSonics provides instructions, user guides and other design documentation to OEMs, manufacturers, customers, resellers and end-use consumers regarding the use and operation of InfoSonics' products in an infringing way. When OEMs, manufacturers, customers, resellers and end-use consumers follow such instructions, user guides and other design documentation, they directly infringe one or more claims of the '663 Patent. InfoSonics knows that by providing such instructions, user guides and other design documentation, OEMs, manufacturers, customers, resellers and end-use consumers follow those instructions, user guides and other design documentation, and directly infringe one or more claims

of the '663 Patent. InfoSonics thus knows that its actions actively induce infringement.

27.     InfoSonics indirectly infringes the '663 Patent by contributing to infringement by others, such as OEMs, manufacturers, customers, resellers and end-use consumers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the OEMs, manufacturers, customers, resellers and end-use consumers of the infringing products.

28.     InfoSonics received notice of the '663 Patent at least as of the date this complaint was filed.

29.     InfoSonics' infringing telephone products allow for a telephone that down-converts a radio frequency input signal as claimed in the '663 Patent. The infringing products cannot operate in an acceptable manner absent the ability to down-convert a higher-frequency signal to a lower-frequency signal.

30.     A reasonable inference to be drawn from the facts alleged above is that a telephone with the ability to down-convert a higher-frequency signal to a lower-frequency signal is not a staple article or commodity of commerce and that this ability is required for operation of the infringing products.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

31.     InfoSonics' infringing telephone products, with the ability to down-convert a higher-frequency signal to a lower-frequency signal, are each a

8

material part of the invention of the '663 Patent and are especially made for the infringing manufacturing, offering for sale, sales and use of the infringing products. InfoSonics' infringing telephone products are especially made or adapted to infringe one or more claims of the '663 Patent. Because the manufacturing, offering for sale, sales and use of the infringing products infringe one or more claims of the '663 Patent, InfoSonics' sales of its infringing products have no substantial non-infringing uses.

32.     Accordingly, a reasonable inference is that InfoSonics offers to sell or sells within the United States at least a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing one or more claims of the '663 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

33.     As a direct and proximate consequence of InfoSonics' acts and practices in infringing, directly and/or indirectly, one or more claims of the '663 Patent, ParkerVision has suffered, is suffering and, unless such acts and practices are enjoined by the Court, will continue to suffer injury to its business and property rights. ParkerVision has also suffered, is suffering and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284, in an amount to be determined at trial.

34.     In addition, InfoSonics' infringing acts and practices have caused, are causing and, unless such acts and practices are enjoined by the Court, will continue to cause immediate and irreparable harm to ParkerVision for which there is no adequate remedy at law, and for which ParkerVision is entitled to injunctive relief under 35 U.S.C. § 283.

35.     InfoSonics has known about the '663 Patent, as alleged above. Moreover, InfoSonics lacks justifiable belief that there is no infringement, or that the infringed claims are invalid, and has acted with objective recklessness in its infringing activity.     InfoSonics' infringement is therefore willful, and ParkerVision is entitled to an award of exemplary damages, attorneys' fees, and costs in bringing this action.

## Count Two—Infringement of the '534 Patent

36.     ParkerVision incorporates the allegations in paragraphs 1 through 17, above.

37.     InfoSonics's telephones infringe at least one claim of the '534 Patent.

38.     InfoSonics has infringed and continues to directly infringe the '534 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by one or more claims of the '534 Patent. InfoSonics' products that infringe one or more claims of the '534 Patent include the S470 and any other InfoSonics device that is capable of down

converting an input signal at the output signal node as claimed in the '534 Patent.

39.     InfoSonics makes, uses, sells, offers for sale, or imports into the United States these products and thus directly infringes one or more claims of the '534 patent. InfoSonics also uses these products via its internal use and testing in the United States, directly infringing one or more claims of the '534 Patent.

40.     InfoSonics has induced and continues to induce and contribute to infringement of the '534 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, telephone products and/or methods covered by one or more claims of the '534 Patent including InfoSonics' telephone products listed above. InfoSonics provides these telephone products to others, such as manufacturers, customers, resellers and end-use consumers who in turn use, offer for sale or sell in the United States these products that infringe one or more claims of the '534 Patent.

41.     InfoSonics indirectly infringes the '534 Patent by inducing infringement by others, such as OEMs, manufacturers, customers, resellers and end-use consumers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the OEMs, manufacturers, customers, resellers and end-use consumers of the infringing products.

42.     InfoSonics had actual knowledge of at the '534 Patent as of the date this lawsuit was filed.

43.     InfoSonics designed the infringing products such that they would each infringe one or more claims of the '534 Patent if made, used, sold, offered for sale, or imported into the United States. InfoSonics provides the infringing products to others, such as OEMs, manufacturers, customers, resellers and end-use consumers who, in turn, offer for sale, sell, import into, or use these infringing products to infringe one or more claims of the '534 Patent. Through its manufacture and sale of the infringing products, InfoSonics specifically intended its OEMs, manufacturers, customers, resellers and end-use consumers to infringe one or more claims of the '534 Patent.

44.     InfoSonics specifically intends for others, such as OEMs, manufacturers, customers, resellers and end-use consumers, to directly infringe one or more claims of the '534 Patent in the United States. For example, InfoSonics provides instructions, user guides and other design documentation to OEMs, manufacturers, customers, resellers and end-use consumers regarding the use and operation of InfoSonics' products in an infringing way. When OEMs, manufacturers, customers, resellers and end-use consumers follow such instructions, user guides and other design documentation, they directly infringe one or more claims of the '534 Patent. InfoSonics knows that by providing such instructions, user guides and other design documentation, OEMs, manufacturers, customers, resellers and end-use consumers follow those instructions, user

guides and other design documentation, and directly infringe one or more claims of the '534 Patent. InfoSonics thus knows that its actions actively induce infringement.

45.     InfoSonics indirectly infringes the '534 Patent by contributing to infringement by others, such as OEMs, manufacturers, customers, resellers and end-use consumers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the OEMs, manufacturers, customers, resellers and end-use consumers of the infringing products.

46.     InfoSonics received notice of the '534 Patent at least as of the date this lawsuit was filed.

47.     InfoSonics' infringing products allow for the down converting of an input signal at the output signal node using a capacitor coupled to the output node. When the infringing products are used to down convert the input signal as claimed in the '534 Patent, the infringing products must necessarily down convert the input signal in an infringing manner. The infringing products cannot operate in an acceptable manner absent the ability to modulate an information signal.

48.     A reasonable inference to be drawn from the facts alleged above is that the ability to down convert the input signal is especially made or especially adapted to operate on InfoSonics' infringing products.

49.    A reasonable inference to be drawn from the facts alleged above is that the ability to down convert the input signal is not a staple article or commodity of commerce and that this ability is required for operation of the infringing products. Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

50.    InfoSonics' infringing products, with the ability to down convert an input signal, are each a material part of the invention of the '534 Patent, are especially made for the infringing manufacturing, offering for sale, sales, and use of the infringing products. InfoSonics' infringing products are especially made or adapted to infringe one or more claims of the '534 Patent. Because the manufacturing, offering for sale, sales and use of the infringing products infringe one or more claims of the '534 Patent, InfoSonics' sales of its infringing products have no substantial non-infringing uses.

51.    Accordingly, a reasonable inference is that InfoSonics offers to sell or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing one or more claims of the '534 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

52.    As a direct and proximate consequence of the acts and practices in infringing, directly and/or indirectly, one or more claims of the '534 patent,

ParkerVision has suffered, is suffering and, unless such acts and practices are enjoined by the Court, will continue to suffer injury to its business and property rights. ParkerVision has also suffered, is suffering and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284, in an amount to be determined at trial.

53.     In addition, InfoSonics' infringing acts and practices have caused, are causing and, unless such acts and practices are enjoined by the Court, will continue to cause immediate and irreparable harm to ParkerVision for which there is no adequate remedy at law, and for which ParkerVision is entitled to injunctive relief under 35 U.S.C. § 283.

54.     InfoSonics has known about the '534 Patent, as alleged above. Moreover, InfoSonics lacks justifiable belief that there is no infringement, or that the infringed claims are invalid, and has acted with objective recklessness in its infringing activity. InfoSonics' infringement is therefore willful, and ParkerVision is entitled to an award of exemplary damages, attorneys' fees and costs in bringing this action.

### Count Three—Infringement of the '149 Patent

55.     ParkerVision incorporates the allegations in paragraphs 1 through 17, above.

56.     InfoSonics' telephones infringe at least one claim of the '149 Patent.

57.     InfoSonics has infringed and continues to directly infringe the '149 Patent by making, using, selling, offering for sale, or importing into the United States telephone products and/or methods covered by one or more claims of the '149 Patent.  InfoSonics' telephone products that infringe one or more claims of the '149 Patent include the S470 and any other InfoSonics device that performs protocol conversion as claimed in the '149 Patent.

58.     InfoSonics makes, uses, sells, offers for sale, or imports into the United States these telephone products and thus directly infringes one or more claims of the '149 Patent.  InfoSonics also uses these telephone products via its internal use and testing in the United States, directly infringing one or more claims of the '149 Patent.

59.     InfoSonics has induced and continues to induce and contribute to infringement of the '149 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by one or more claims of the '149 Patent including InfoSonics' telephone products listed above. InfoSonics provides these telephone products to others, such as manufacturers, customers, resellers and end-use consumers who, in turn, use, offer for sale or sell in the United States these products that infringe one or more claims of the '149 Patent.

60.     InfoSonics indirectly infringes the '149 Patent by inducing infringement by others, such as OEMs, manufacturers, customers, resellers and end-use consumers, in accordance with 35 U.S.C. § 271(b) in this District and

elsewhere in the United States. Direct infringement is the result of activities performed by the OEMs, manufacturers, customers, resellers and end-use consumers of the infringing products.

61.     InfoSonics has had knowledge of the '149 Patent since at least the date this lawsuit was filed.

62.     InfoSonics designed the infringing products such that they would each infringe one or more claims of the '149 Patent if made, used, sold, offered for sale or imported into the United States. InfoSonics provides the infringing products to others, such as OEMs, manufacturers, customers, resellers and end-use consumers who, in turn, offer for sale, sell, import into, or use these infringing products to infringe one or more claims of the '149 Patent. Through its manufacture and sale of the infringing products, InfoSonics specifically intended its OEMs, manufacturers, customers, resellers and end-use consumers to infringe one or more claims of the '149 Patent.

63.     InfoSonics specifically intends for others, such as OEMs, manufacturers, customers, resellers and end-use consumers, to directly infringe one or more claims of the '149 Patent in the United States. For example, InfoSonics provides instructions, user guides and other design documentation to OEMs, manufacturers, customers, resellers and end-use consumers regarding the use and operation of InfoSonics' products in an infringing way. When OEMs, manufacturers, customers, resellers and end-use consumers follow such instructions, user guides and other design documentation, they directly infringe

one or more claims of the '149 Patent. InfoSonics knows that by providing such instructions, user guides and other design documentation, OEMs, manufacturers, customers, resellers and end-use consumers follow those instructions, user guides and other design documentation, and directly infringe one or more claims of the '149 Patent. InfoSonics thus knows that its actions actively induce infringement.

64.   InfoSonics indirectly infringes the '149 Patent by contributing to infringement by others, such as OEMs, manufacturers, customers, resellers and end-use consumers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the OEMs, manufacturers, customers, resellers and end-use consumers of the infringing products.

65.   InfoSonics received notice of the '149 Patent at least as of the date this lawsuit was filed.

66.   InfoSonics' infringing products allow for the operation of a telephone that includes protocol converter module and or is configured to perform protocol conversion. When the infringing products are used to operate as designed, the infringing products must necessarily operate in an infringing manner. The infringing products cannot operate in an acceptable manner absent the ability to operate as recited in one or more claims of the '149 Patent.

67.   A reasonable inference to be drawn from the facts alleged above is that the ability for the operation of a telephone to utilize more than one protocol

is especially made or especially adapted to operate on InfoSonics' infringing products.

68.    A reasonable inference to be drawn from the facts alleged above is that the ability for the operation of a protocol converter is not a staple article or commodity of commerce and that this ability is required for operation of the infringing products. Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

69.    InfoSonics' infringing products, with the ability for the operation of a protocol converter module and/or to perform protocol conversion, are a material part of the invention of the '149 Patent, are especially made for the infringing manufacturing, offering for sale, sales and use of the infringing products.  InfoSonics' infringing products are especially made or adapted to infringe one or more claims of the '149 Patent. Because the manufacturing, offering for sale, sales and use of the infringing products infringe one or more claims of the '149 Patent, InfoSonics' sales of its infringing products have no substantial non-infringing uses.

70.    Accordingly, a reasonable inference is that InfoSonics offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing one or more claims of the '149 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for

use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

71.     As a direct and proximate consequence of InfoSonics' acts and practices in infringing, directly and/or indirectly, one or more claims of the '149 Patent, ParkerVision has suffered, is suffering, and, unless such acts and practices are enjoined by the Court, will continue to suffer injury to its business and property rights. ParkerVision has also suffered, is suffering, and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284, in an amount to be determined at trial.

72.     In addition, InfoSonics's infringing acts and practices have caused, are causing and, unless such acts and practices are enjoined by the Court, will continue to cause immediate and irreparable harm to ParkerVision for which there is no adequate remedy at law, and for which ParkerVision is entitled to injunctive relief under 35 U.S.C. § 283.

73.     InfoSonics has known about the '149 Patent, as alleged above. Moreover, InfoSonics lacks justifiable belief that there is no infringement, or that the infringed claims are invalid, and has acted with objective recklessness in its infringing activity.   InfoSonics' infringement is therefore willful, and ParkerVision is entitled to an award of exemplary damages, attorneys' fees and costs in bringing this action.

## **Prayer for relief**

WHEREFORE, ParkerVision respectfully requests that this Court enter judgment in ParkerVision's favor, granting the following relief:

A.    an award of damages in an amount adequate to compensate ParkerVision for InfoSonics' infringing products' infringement of the claims of the patents-in-suit, but in no event less than a reasonable royalty, and supplemental damages for any continuing post-verdict infringement up until entry of the final judgment with an accounting as needed, under 35 U.S.C. § 284;

B.    an award of enhanced damages pursuant to 35 U.S.C. § 284 for InfoSonics' willful and deliberate infringement;

C.    an award of pre-judgment interest and post-judgment interest on the damages awarded, including pre-judgment interest, pursuant to 35 U.S.C. § 284, from the date of each act of infringement of the patents-in-suit by InfoSonics to the day a damages judgment is entered, and an award of post-judgment interest, pursuant to 28 U.S.C. § 1961, continuing until such judgment is paid, at the maximum rate allowed by law;

D.    an award of costs of this action (including all disbursements) and attorneys' fees, pursuant to 35 U.S.C. § 285 based on a finding that this is an exceptional case;

E.    an accounting for damages;

F.    a permanent injunction enjoining InfoSonics, and all others in active concert with InfoSonics, from further infringement of the patents-in-suit;

G.      an award of compulsory future royalties for any patent of the patents-in-suit for which an injunction does not issue; and

H.      an award of such further relief as the Court deems just and proper.

### Jury demand

ParkerVision demands a jury for all issues so triable.

SMITH HULSEY & BUSEY

By
            Stephen D. Busey
            James A. Bolling

Florida Bar Number 117790
Florida Bar Number 901253
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
busey@smithhulsey.com
jbolling@smithhulsey.com

Attorneys for ParkerVision, Inc.

905749.2

22